Document Number Case Number
04-C-0881-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
12/27/2004 04:42:21 PM CST

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

INGRAM BARGE COMPANY,      )
                           )
          Plaintiff,      )
                           )
v.                          )     Case No. 04 C 0881 C
                           )
DAIRYLAND POWER COOPERATIVE,  )
                           )
          Defendant.    )

## ANSWER AND COUNTERCLAIM

### ANSWER

Now comes Dairyland Power Cooperative ("Dairyland"), and as an Answer to the Complaint states as follows:

#### Parties

1.     Answering Paragraph 1 of the Complaint, Dairyland admits.

2.     Answering Paragraph 2 of the Complaint, Dairyland admits.

#### Jurisdiction

3.     Answering Paragraph 3 of the Complaint, Dairyland admits.

4.     Answering Paragraph 4 of the Complaint, Dairyland admits.

#### Facts

5.     Answering Paragraph 5 of the Complaint, Dairyland admits.

6.     Answering Paragraph 6 of the Complaint, Dairyland admits.

7.     Answering Paragraph 7 of the Complaint:

     a.     Dairyland admits the first sentence of said paragraph.

b.    Dairyland denies the second and third sentences of Paragraph 7. Dairyland denies that Exhibit 1 as defined in Paragraph 7 as the "Tendered Agreement" and as referenced throughout the Complaint was the final form of any written contract they contemplated executing. Dairyland affirmatively alleges that the parties reached a binding contract for barge transportation of coal (hereafter the "Transportation Agreement"), the terms of which were substantially similar  but not identical to those contained in Complaint Exhibit 1, but denies that Exhibit 1 is the "Tendered Agreement" as defined in paragraph 7.

c.    Dairyland incorporates the denials and allegations contained in its answer to Paragraph 7 into all answers to subsequent allegations which use the term "Tendered Agreement" as defined in this Complaint.

8.    Answering Paragraph 8 of the Complaint,  Dairyland states as follows:

a.    Dairyland denies that the "Tendered Agreement" as defined was the parties' agreement, and thus denies the allegations of said paragraph.

b.    Dairyland admits that the parties agreed that Ingram would transport coal via the Mississippi and Ohio Rivers from locations in Illinois, Iowa, Missouri and Indiana to Dairyland's plants in Genoa and Alma Wisconsin, and admits that the Transportation Agreement  covered the period January 1, 2004 through December 31, 2008.

9.    Answering Paragraph 9 of the Complaint, Dairyland denies the allegations as they incorporate the defined term, "Tendered Agreement," but admits that the parties agreed that Ingram would transport between 1,000,000 and 1,600,000 tons of coal

2

annually, and admits that the parties agreed in the Transportation Agreement to language substantially similar to Part I,§ 5 of Exhibit 1.

10.    Answering Paragraph 10, Dairyland denies the allegations as they incorporate the defined term "Tendered Agreement", but admits that the parties agreed to language in the Transportation Agreement similar to that contained in Exhibit 1, Part I, Special Provisions, § 4. Dairyland affirmatively alleges that the Transportation Agreement specifically provided that Ingram would "begin deliveries as soon as the river is cleared of ice (approximately 3/15 to 4/01)" and that the nominal cut off dates "for accepting last barge loadings *in general*" (emphasis supplied) would be (1) from St. Louis to Genoa: October 15; (2) from St. Louis to Alma: October 10; (3) from Lower Ohio to Genoa: October 10; (4) from Lower Ohio to Alma: October 10.

11.    Answering Paragraph 11, Dairyland denies the allegations as they incorporate the defined term "Tendered Agreement", but admits that the parties agreed in the Transportation Agreement that Dairyland, as "Shipper", would use its *best efforts* (emphasis supplied) to deliver to Ingram as "Carrier" all coal to be transported in any given year in substantially equal monthly quantities and in approximately equal weekly quantities during the month, along with other terms, and conditions.

12.    Answering Paragraph 12, Dairyland admits that during 2004, Ingram transported coal on behalf of Dairyland, admits not executing the document defined as the "Tendered Agreement" as attached to the Complaint as Exhibit 1, but affirmatively alleges that a binding agreement was reached by Ingram Barge and Dairyland to cover the 2004 shipping season, and alleges that pursuant to that Transportation Agreement Ingram began river barge coal transport on behalf of Dairyland in March 2004.

3

13.    Answering Paragraph 13, Dairyland admits.

14.    Answering Paragraph 14,  Dairyland denies, and affirmatively alleges that it complied with its obligations under the Transportation Agreement to deliver coal for transport by Ingram.  Dairyland alleges that Ingram waived objection to the pace of coal delivery for loading, and is estopped to contend Dairyland failed to deliver coal for loading at an appropriate rate.

15.    Answering Paragraph 15, Dairyland denies the allegations of said paragraph, except that it admits that it engaged in exchange of emails with Ingram and communications with Ingram regarding barge loading for October, 2004, and admits that Exhibit 2 contains copies of some of those communications.  Dairyland alleges that the Transportation Agreement covering 2004 provided for loading and transportation by Ingram during the shipping season, including that part of the season after October 15. Dairyland alleges that it notified Ingram during the shipping season that it intended to load barges into the latter part of October and after October 15. Ingram registered no objection until September 28, 2004.  On September 28, 2004, Ingram for the first time informed Dairyland that it would not load barges after October 15.  Ingram's stated intention was in violation of its obligations under the Transportation Agreement.  Ingram waived objection to loading after October 15 and was estopped to refuse to load during that part of the shipping season after October 15 at the agreed rates.  Dairyland further affirmatively alleges that any arrangements made with  Ingram for loading coal after October 15 were made under protest, without waiver, and with reservation of all rights available to Dairyland.

4

16.     Answering Paragraph 16, Dairyland denies, except that it admits that Exhibit 3 is a copy of an email send by Dennis Rackers to Ken Sigler on October 12, 2004.  To the extent Ingram asserts Exhibit 3 constitutes an acceptance of the Ingram Barge Proposal, which Dairyland denies, Dairyland affirmatively alleges that such acceptance was made under protest, without waiver, and with reservation of all rights available to Dairyland.

17.     Answering Paragraph 17, Dairyland specifically re-incorporates its answer to Paragraph 7 of the Complaint.  Dairyland admits that Ingram contends that the emails described had the effect as alleged in the first sentence of this paragraph of the Complaint, but denies that the emails had the effect as alleged.  Dairyland denies the second sentence of Paragraph 17 of the Complaint.  Dairyland admits that Ingram contends that Dairyland's rights are limited as alleged in the third sentence of Paragraph 17, but denies that its rights are in any way limited as Ingram contends.

18.     Answering Paragraph 18, Dairyland specifically re-incorporates its answer to Paragraph 7 of the Complaint.  Dairyland admits the allegations of Paragraph 18, and alleges that the email exchange of the parties did not effect a modification of the agreement covering the 2004 shipping season or otherwise.

19.     Answering Paragraph 19, Dairyland  is without information sufficient to form a belief as to the allegations of this paragraph and therefore denies the same.

20.     Answering Paragraph 20, Dairyland is without information sufficient to form a belief as to the allegations of this paragraph and therefore denies the same.

21.     Answering Paragraph 21, Dairyland denies that the agreement as defined in the Complaint or the Transportation Agreement between the parties is governed by

either the laws of Wisconsin or Tennessee and affirmatively alleges that the

Transportation Agreement is governed by the general maritime laws of the United States

as well as the laws of the State of Wisconsin where not pre-empted by Federal law.

Dairyland denies the allegations of the second sentence of Paragraph 21, affirmatively

alleges that the terms of the referenced statutes speak for themselves, and alleges that said

statutes are subject to the other laws of their respective jurisdictions regarding their

meaning and effect.  Dairyland affirmatively alleges that its agreement with Ingram

covering the 2004 shipping season is not void under any applicable statute of frauds and

is enforceable under the general maritime laws of the United States.

      22.     Answering Paragraph 22, Dairyland specifically re-incorporates its answer

to Paragraph 7 of the Complaint.  Defendant admits that the document attached to the

Complaint as Exhibit 1 defined as the "Tendered Agreement" by its terms is not to be

performed within one (1) year, and admits that the document attached to the Complaint as

Exhibit 1 was not signed by Dairyland. Dairyland alleges the Transportation Agreement

between the parties was signed by Ingram and is enforceable against it.

      23.     Answering Paragraph 23, Dairyland moves to strike the allegations of this

paragraph as referring to documents and transactions that would be inadmissible in any

controversy between the parties under Federal Rule of Evidence 408.  Subject to this

motion to strike, and without waiver, Dairyland admits to having forwarded a proposal to

resolve this dispute in the context of  a settlement discussion, which proposal Ingram was

unwilling to execute, and admits to declining to execute Exhibit 1 to the Complaint which

is alleged to be the "Tendered Agreement".

<u>COUNT I</u>

**DECLARATORY JUDGMENT AS TO PARTIES' RIGHTS AND OBLIGATIONS
FOR 2004 SHIPPING SEASON**

24.     Answering Paragraph 24, Dairyland re-alleges as if set forth at length its answers and responses to Paragraphs 1 – 23.

25.     Answering Paragraph 25, Dairyland admits the allegations of this paragraph.

26.     Answering Paragraph 26, Dairyland admits the allegations of this paragraph.

27.     Answering Paragraph 27, this paragraph is a statement of the relief sought to which no response is required.  To the extent that a response is required, Dairyland: (a) denies that Ingram performed in accordance with the terms contained in the document attached to the Complaint as Exhibit 1 and characterized as the "Tendered Agreement" and denies that Ingram performed in compliance with the Transportation Agreement covering the 2004 shipping season; (b) denies that the email exchange described in Paragraph 27(b) and elsewhere in the Complaint constituted a written modification of the "Tendered Agreement" or otherwise modified the Transportation Agreement; (c) denies that Ingram Barge acted in accord with the terms of the "Tendered Agreement" or otherwise acted in accordance with the Transportation Agreement; (d) denies that by virtue of its performance during the 2004 shipping season, Ingram is not liable to Dairyland for damages and affirmatively alleges that Ingram Barge is liable for damages arising from its breach of the Transportation Agreement.

## COUNT II

### DECLARATORY JUDGMENT AS TO PARTIES' RIGHTS AND OBLIGATIONS FOR FUTURE SHIPPING SEASONS

28.  Answering Paragraphs 28 through 31, pursuant to the Stipulation on file with the Court, Count II of the Complaint has been dismissed and no answer is required for these paragraphs.

## COUNTERCLAIM FOR DAMAGES

Defendant Dairyland Power Cooperative  as a Counterclaim in the above-captioned action, alleges as follows.

### Parties

1.  Plaintiff Ingram Barge is a corporation organized under the laws of the State of Tennessee with its principal place of business in Nashville, Tennessee.

2.  Defendant Dairyland Power Cooperative ("Dairyland") is a cooperative association organized under the laws of the State of Wisconsin with its principal place of business in La Crosse, Wisconsin.

### Jurisdiction

3.  This  action arises out of commerce and transportation in navigable waters, giving this Court jurisdiction pursuant to 28 U.S.C. §1333.

4.  Complete diversity of citizenship also exists between the parties and the amount in controversy exceeds $75,000.00, giving this Court jurisdiction pursuant to 28 U.S.C. §1332.

8

**Facts**

5.     Dairyland operates coal-fired electricity generation facilities in Genoa and Alma, Wisconsin.  Coal is supplied to these facilities  through river barge transportation on the Mississippi and Ohio Rivers.  Because of winter weather conditions, the coal shipping season begins in the late winter or early spring when the river is clear of ice and ends in the fall before ice  limits barge traffic on the rivers.

6.     On an annual basis, coal is brought to Dairyland's generation facilities throughout the shipping season, and stockpiled for use as generator fuel over the season when the river closes to coal barge traffic.  When the river opens toward spring for navigation, coal barge traffic begins again, and depleted stockpiles of coal begin to be restored.

7.     Ingram Barge provides, among other things,  barge transportation services on the Mississippi River of the nature required by Dairyland to bring coal to its facilities. Ingram Barge, as a "carrier" will accept coal into its barges for a "shipper" such as Dairyland at a downstream part of the river system, and deliver it to the shipper's off–loading destination point at a more northerly, upstream point on the system.

8.     Prior to March of 2004, Ingram and Dairyland negotiated an agreement for coal barge transportation services (the "Transportation Agreement") under which Ingram would move coal from downstream dock locations on the Ohio and Mississippi Rivers to Dairyland's electric generation facilities at Genoa and Alma, Wisconsin.

9.     This Transportation Agreement covered the 2004 shipping season as well as the 2005, 2006, 2007 and 2008 shipping seasons.

10. The negotiation process involved oral communications as well as exchanges of drafts and proposals containing the Transportation Agreement's terms and conditions.

11. The terms and conditions of the Transportation Agreement were confirmed by Ingram Barge in electronic documents contained the electronic signature of Kenneth A. Sigler, Manager of Utility Sales for Ingram Barge.

12. As of March 9, 2004, the parties had agreed on the essential commercial and performance terms and conditions for the Transportation Agreement covering the 2004 – 2008 shipping seasons.

13. The Transportation Agreement included the following terms and conditions:

a) "Deliveries:  The shipping period is *approximately* 32 weeks per year; Carrier will begin deliveries as soon as the river is cleared of ice (*approximately* 3/15 to 4/01).  (emphasis supplied)

The following cut-off dates for accepting last barge loadings *in general* will be adhered to by Carrier for the Upper Mississippi River navigation season):

| To: | | Genoa | Alma |
|---|---|---|---|
| From: | St. Louis | 10/15 | 10/10 |
| | Lower Ohio | 10/10 | 10/10" |

(emphasis supplied)

b) "Ratability: Shipper agrees to *use its best efforts* to deliver to Carrier all coal to be transported in any year in substantially equal monthly quantities and in approximately equal weekly quantities during the month, and Carrier agrees to accept such coal from Shipper when offered for transportation and deliver it to Shipper without delay other than normal delays incidental to barge transportation…" (emphasis supplied)

c) The agreement would be governed by the laws of the State of Wisconsin.

d) Ingram Barge would transport between 1 million and 1.6 million net tons of coal annually.

14.     The parties began performance of the Transportation Agreement on or about March 9, 2004.   Ingram began accepting Dairyland coal on Ingram barges, and transporting and delivering that coal north on the Mississippi River to Dairyland's facilities at Alma and Genoa.

15.     From time to time over the months that followed, Dairyland made Ingram aware of its plans, and changes to plans, to make coal available for shipment by Ingram over the course of the shipping season.  Dairyland notified Ingram during the shipping season that it intended to load barges into the latter part of October and after October 15.

16.     Prior to September 28, 2004 Ingram never objected to Dairyland's proposed schedules and plans, including plans to load after October 15, or the rate at which barges in fact were loaded.   Prior to September 28, 2004 Ingram never indicated an unwillingness to continue loading after October 15.

17.     In conversations with Dairyland prior to September 28, Ingram personnel had stated October 15th was only a guideline for last load dates, and that it would continue to load Dairyland coal through the shipping season so long as its barges would be able to complete unloading at Dairyland's facilities, be loaded with grain on the Upper Mississippi River, and then be headed downstream by Thanksgiving for the final seasonal downriver trip.

18.     On or about September 28, 2004, Ingram first advised that it would not accept barges with Dairyland coal after October 15, 2004.

19.     Through its knowledge of Dairyland's plans to load barges after October 15, 2004 and its failure to timely object to those plans, Ingram waived objection to loading after October 15, 2004.

11

20.    Upon being notified that Ingram would not load Dairyland coal onto its barges after October 15, 2004, Dairyland immediately sought alternative barge transportation for its needs for the remainder of the 2004 shipping season.

21.    In reliance on Ingram's failure to object to Dairyland's plans to load after October 15, 2004, Dairyland did not make alternate arrangements to transport coal by other carriers until after September 28, 2004.  Had Dairyland been advised earlier that Ingram did not intend to load after October 15, 2004, it would have been able to arrange alternate carriage at rates lower than it was required to pay for alternate transport.

22.    By its failure to object to the rate of prior loading and its failure to earlier advise of its intention not to load after October 15, 2004, Ingram waived objection to loading after that date and was estopped to assert it was entitled to refuse to load during that part of the shipping season after October 15.

23.    While Ingram ultimately provided approximately thirty (30) additional barges for loading after October 15, 2004, it did so only after attempting to unilaterally impose conditions and extract compensation above the rates previously agreed upon by the parties in the Transportation Agreement.

24.    Ingram ultimately transported approximately 1,310,960 tons of coal for Dairyland during the 2004 shipping season.

25.    Ingram refused to carry 120,341 tons of coal by barge on the Mississippi before the end of the 2004 shipping season.

26.    This refusal was in breach of its Transportation Agreement with Dairyland.

12

27.    Dairyland transported the tonnage Ingram refused to carry by alternate barge carriers to cover for Ingram's breach.

28.    As a direct result of Ingram's breach, Dairyland incurred one million eight hundred forty four thousand three hundred and twenty eight dollars ($1,844,328) in additional shipping charges for using alternative barge carriers, over and above the charges that would have applied for transporting this tonnage under the Transportation Agreement.

WHEREFORE, Dairyland prays for the following relief:

1. On Ingram Barge's Declaratory Judgment Action, for a judgment declaring:

a) That Ingram Barge and Dairyland had a binding agreement covering the 2004 shipping season that required Ingram to carry the tonnage described in Paragraphs 25-27 of the Counterclaim;

b) That Ingram Barge violated that agreement;

c) That Ingram Barge is liable to Dairyland for damages directly resulting from its breach of that agreement;

2. On Dairyland Power Cooperative's Counterclaim:

a) For a judgment in favor of Dairyland Power Cooperative and against Ingram Barge Company for compensatory damages of one million eight hundred forty four thousand three hundred and twenty eight dollars ($1,844,328).

3. On all claims:

a) For court costs and expenses as allowed by law.

b) For such other relief as the court deems just and equitable, and to which it is entitled.

13

Dated this 23rd day of December 2004.

_____
Stuart G. Mondschein
Thomas J. Zaremba
Attorneys for Defendant Dairyland Power
Cooperative

WHEELER, VAN SICKLE & ANDERSON, S.C.
25 West Main Street, Suite 801
Madison, WI 53703
Phone: 608-255-7277
Fax: 608-255-6006

14